**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-CV-0622-KMT
(To be supplied by the court)

RECEIVED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

FEB 11 2019

JEFFREY P. COLWELL
CLERK

Naser J. Abdo , Plaintiff,

v.

1) J. Munoz (individual capacity) , 2) I. Johnston

3) Craig J (individual capacity) .

4) Balsick A (individual capacity) .

5) Starika
   Perez J (individual capacity) .

6) Lt. Fernadez (individual capacity).

7) Lt. Melvin (individual capacity).

8) Nurse Levi Williams (individual capacity)

9) United States , Defendant(s).

(List each named defendant on a separate line.)

_____

**PRISONER COMPLAINT**

_____

(Rev. 1/30/07)

2

**A. PARTIES**

1. Naser Abdo, 3088228C, usPenitentiary Max, PO Box 8500, Florence, CO,
   _____
   (Plaintiff's name, prisoner identification number, and complete mailing address)
   81226.

2. J. Munoz, Officer, unknown address.
   _____
   (Name, title, and address of first defendant)

   At the time the claim(s) alleged in this complaint arose, was this defendant acting under
   color of ~~state~~ law? ✓ Yes ___ No (CHECK ONE). Briefly explain your answer:
   Fed.

3. I. Johnston, Officer, unknown Address
   _____
   (Name, title, and address of second defendant)

   At the time the claim(s) alleged in this complaint arose, was this defendant acting under
   color of ~~state~~ law? ✓ Yes ___ No (CHECK ONE). Briefly explain your answer:
   Fed.

4. J. Graig, Lt., unknown address
   _____
   (Name, title, and address of third defendant)

   At the time the claim(s) alleged in this complaint arose, was this defendant acting under
   color of ~~state~~ law? ✓ Yes ___ No (CHECK ONE). Briefly explain your answer:
   Fed.

(If you are suing more than three defendants, use extra paper to provide the information
requested above for each additional defendant. The information about additional defendants
should be labeled "A. PARTIES.")

(Rev. 1/30/07)                    2

## A. Parties

Fourth Defendant: A. Balsick, officer, unknown address.
• Def. 4 was working under color of Fed. law at the time alleged.

Fifth Defendant: Stanika, officer, unknown address.
• Def. 5 was working under color of Fed. law at time alleged.

Sixth Defendant: Fernandez, Lt., unknown address.
• Def. 6 was working under color of Fed. law at time alleged.

Seventh Defendant: Melvin, Lt., unknown address.
• Def. 7 was working under color of Fed. law at time alleged.

Eighth Defendant: Levi Williams, Nurse, unknown address.
• Def. 8 was working under color of Fed. law at time alleged.

Ninth Defendant: United States, unknown address.
• Def. 9 was working under color of Fed. law at time alleged.

4

## B. JURISDICTION

1. I assert jurisdiction over my civil rights claim(s) pursuant to: (check one if applicable)

    ____ 28 U.S.C. § 1343 and 42 U.S.C. § 1983 (state prisoners)

    ✓ 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal prisoners)

2. I assert jurisdiction pursuant to the following additional or alternative statutes (if any):

    28 U.S.C. § 1346 (b)(1) $ Colorado Tort Law.

    The U.S. waives sovereign immunity via 28 U.S.C. § 2671-2680.

## C. NATURE OF THE CASE

**BRIEFLY** state the background of your case. If more space is needed to describe the nature of the case, use extra paper to complete this section. The additional allegations regarding the nature of the case should be labeled "C. NATURE OF THE CASE."

See Following pages.

# C. Nature Of The Case /// Facts
## (Claims 1-6)

1. I am and was, at all times concerning all events in this section, a federal prisoner at ADX, Florence; further, All of the individual defendants were employed by the B.O.P. and on-duty at the times and for the events alleged.

2. On 12-9-16 I had been housed for a few days, at that point, in the medical wing's one of two cells due to my hunger strike which was in it's ninth day.

3. Lt. Fernandez, defendant 6 [hereinafter Def. 6], promised me that he would give me my confiscated religious property such as my Quran, Prayer-rug, Prayer-schedule and a Watch to identify the time for prayer if I complied and voluntarily submitted to a medical assessment, which I had a right to refuse, such as is conducted usually three times weekly per-hunger-strike policy and practice. I did so, I complied with Def. 6's request because I had nothing but my clothes in the cell and because I am a practicing muslim.

4. Lt. Fernandez, Def. 6, never fulfilled his promise; so, when Defs. 3 and 5 came to feed dinner, after having complained for hours and trying to get the attention of guards in this isolated part of the prison whom I talked to and told me they would call Def. 6 concerning my complaint, and after having received no relief, I placed my arm outside the food-slot and told Defs. 3 and 5 I needed to speak with Def. 6 or any Lt. so that I could get my promised religious property.

5. Defs. 3 and 5 were then joined by Def. 4. They told me that they would try to get me my religious property if I removed my arm; but knowing that my property was in the custody of a Lt. I repeatedly told them that they didn't have the authority to access and distribute my property, only a Lt. could. I understood due to my experience as a prisoner at ADX that they, just as Def. 6 earlier that day, were lying only to relieve themselves of any short term problem that would be abated

just long enough for them to go home at shift's end and effectively throw the problem onto the other succeeding staff. I knew this because once an inmate's property is taken for any legal or illegal reason, policy and practice require it only be returned at a Lt.'s discretion.

6. While talking with the Defs. for this 2 or 3 minutes, they were all standing far away from the door, out of arm's reach, and at no time was I rude nor threatening to them either by action or by voice.

7. Defs. 3 and 4 then began to insult and threaten me saying the following, "You are always whining", "the reason for all your mistreatment is because of your [terrorism] case, this is Karma", spoken by Def. 3, "Why did you go AWOL!", "Dumbass", "you're the one I'm going to blame", responding to my statement that I shouldn't be blamed when I have rights to basic religious property that was taken as a punishment for being on a hunger-strike. In the course of these insults, they became increasingly angry and vengeful as they began to talk about my case making statements I don't fully recall in detail and raising their voices. Def. 5 didn't do these things.

8. Def. 4 then said, "if you don't pull your arm back we are going to gas your fucking ass". I refused to pull my arm back. Def. 4 turned to Def. 3 asking, "do you have your gas on you?" he responded no and was then instructed to retrieve his gas. He then left the medical wing entering the ADX hallway and returned, presumably, to his unit-of-duty, K-unit, where he would have kept any personal or work related belongings.

9. Because my head was clearly exposed at the food-slot, I placed my left leg in the slot, removing my arm, allowing me to stand on one leg and prevent any direct gassing to my face. Due to my emaciated condition, as I had already went on a 26 day hunger-strike months prior over not receiving medical treatment, and the current strike, I was able to fit my entire leg through the slot. At no time did I move my leg suddenly, strike nor threaten to strike any officer. Also, the officers were at all times well away from the door, outside of

striking range, as would be expected of trained safety conscious staff. Not knowing what to expect, i.e., how far they would take this, especially seeing as how I knew they had no right to use "immediate force" short of an emergency threat, I removed my head from potential harm.

10. Def. 4 then threatened ▆▆▆▆▆▆▆▆▆▆, "we always win, we are going to gas you up and then four-point you." Def. 3 then returned after about a three minute absence and I refused to give up the slot untill I spoke to a Lt. Four-pointing is an extra-judicial form of punishment exploited by officers in prison.

11. Def. 4 then nods at Def. 3 as Def. 4 grabs my leg and Def. 3 gasses my cell through the slot for 8 seconds. After emptying the gas canister Def. 3 then takes my leg and slams it against protruding metal locking mechanisms on the doors outer surface which evokes a cry of pain. The entire time I am struggling to stand up and maintain my balance on the other leg.

12. Seeing that they were trying to seriously injure me and being completely unable to protect myself, my leg, I told them, "i'll pull my leg back, let me pull my leg back!." The staff members became irate and increasingly hateful as they continued to hurt me. Def. 4 responded, "we are gonna fu** you up, it's too late for that!" and "you're not getting it back!."

13. Def. 3 then forcefully straightened ▆ my leg by stepping backward pulling me to the doors inner surface and continued to step backward untill my leg was fully extended; he then stabilized my leg by grabbing it with his arms and holding it to his chest. This not only prevented me from pulling my leg back, but because he had pulled my body flush with the door, my left groin area was exposed through the food slot; although, it was only just inside the cell.

14. Def. 4 then sieezed this opportunity to punch my left groin area with full force 20 times, striking my testicles and inner left thigh. Throughout this time, and before, I continued to plead, "i'll pull my leg back" and "why are you hitting me in the balls!." He responded by putting his face close to the cell door window,

and shouting as he hit me, "i'm gonna fuck you up Abdo!"

15. Def.3 continued to stabilize my leg ordering Def.5, "hit him [with your baton]." Up to that point she hadn't actually hurt me in any way, but she then hit me with her baton once or twice in my left shin.

16. Shortly before/after that, other officers ran into the room followed by Lt. Meling Def. 7. Appealing to him I said, "Lt., you need to calm these guys down; I told them i'd pull my leg back." He confirmed, "you'll pull it back?" I said, "yeah." He then ordered them to drop my leg and I pulled it back. With what few seconds remained before being ordered to cuff up, I washed some of the gas off my hands in the cell sink. I then cuffed up.

17. Once the camera arrived, I stated several times, "I didn't assault the C.O.'s, they assaulted me." I had no time to examine my left groin area, nor at that time did I experience any type of residual pain. ████████ Over the next 2 or 3 days, my leg and groin began to tighten up and became extremely sore, limiting my movement at times. I noticed swaths of swelling & bruising from my mid-thigh (left) to my groin covering the area of a ½ sheet of paper. Further in February 2017 I was given nerve pain pills after being seen due to my leg pain that lasted about 4-6 months. It was fiery lasting nerve pain see (Ex. 8 (medical records).

18. Two pieces of footage exist where I can be seen and one piece of footage exists where both parties can be seen, too include the actual assault. The former is the cells 2 cameras (also present in the cell regarding claims 7-14); the latter is a camera that views the cell doors from the opposing wall opposite the medical cells themselves.

## (Claims 7-14)

19. On 12-10-16, for the 14 hours prior to 7 a.m. I was still in ambulatory restraints. I was in the only other medical observation cell, the one next door to the previous one. I was in legshackles a belly chain with a black box securing my hands at my belly button in hard restraints which keeps my arms at my sides allowing me, for example, to scratch my upper thigh but not my forearms, waist or groin. Complex tasks like tucking in the shirt and wiping ones own rear after defecating are nigh impossible. Basically, my range of motion was extremely limited as to pacify any threat I may pose.

20. From 12-9-16, 5p.m., to 12-10-16, 5a.m., I was checked every 2 hours by Lt. Melvin, Def. 7, according to B.O.P. restraints use policy. At the first check, directly after being restrained, I spoke with Def. 7 and told him what occured prior with Defs. 3, 4 and 5. Over this 12 hour period, I repeatedly told him that I refuse to come out of restraints "untill I talk to SIS [Special Investigation Service] about being assaulted yesterday."

21. Due to the amount of attention an inmate who is in restraints for prolonged periods of time necessarily receives, according to policy, from the Warden, Regional office and even the Central B.O.P. office in Washington, if restrained long enough, staying in restraints is a Form of protest prisoners often use to draw attention to grievous wrongs that aren't being resolved; although, due to the severe cramps, pain and Filthiness of this form of protest produces, many prisoners don't do this. This is why I refused to come out of restraints, to ensure that the staff who assaulted me didn't get away with it. See Ex. 2, pp. 13, 17-18, 20.

22. At 7:10 a.m., Defs. 6, 8 and officers Lynch and Ross arrived to do a restraint check. Def. 6 ordered me very disrespectfully to remove my blanket through the door, because of this I took my time. When the door opened, he stormed into the cell and threw the blanket ███████ outside the cell.

23. He told Lynch and Ross to "lift him up," they grabbed me and lifted me up but seeing how he was continuing to try and humiliate me, i.e., he didn't even ask me to stand up, preferring to physically intimidate me into coming out of restraints instead, I lifted up my legs forcing them to carry me saying, "if you want to come in here and talk tough, you can carry me."

24. Def. 8 then tried to conduct the medical assessment but the vitals machine wasn't able to read my blood pressure, etc..., due to the restraints. After re-trying the machine 2 or 3 more times, Def. 6 said,

"your coming out of restraints!" I responded, "no I am not." He then told the officers to put me against the wall; they did so and slammed me into the wall.

25. Ross tried to remove my right leg shackle, I moved my right leg to avoid coming out of restraints. Lynch then, still pressing me into the wall, picked me up and slammed me onto the bed while I was still in full ambulatory restraints. To protect myself I curled my body into the 'fetal position.' I was still and not moving at all.

26. Def. 6 then pulled out his gas canister, brought it less than a feet from my face, I estimate 6 inches because I was staring at the canister which appeared like a large blur due to its closeness, and emptied it into my face for five seconds until there was no more gas left. Still absolutely still, restrained, whilst my leg restraints were still visably in place, the only movement I made was a futile attempt to turn my head in the other direction to avoid the gas. At all times during the gassing Lynch was pinning me down to the bed, Lynch is at least 260 pounds; if not more. I was, at that time, 150 pounds or less.

27. At all times, Def. 8 was at the cell door observing the whole interaction.

28. For the next three and one-half hours, I was completely blind and tearing uncontrollably, unable to even open my eyes for a split-second ████████████ i.e, I, had I been asked, could not have even glanced at anyone or anything to ascertain the identities, sex or even race of anyone present thereafter.

29. Def. 6 then shouted," you want to assault my officers yesterday!" I responded, "I didn't assault anyone, they assaulted me." As about 2 or 3 minutes passed, I said "I didn't do anything" and "you can't do this to people" and "this is wrong what you do to people."

30. I was then escorted to the shower and held under a running water head for only 30 seconds, I was still fully restrained and unable to even touch my face and wash it or any other part of my body. Nor did any officer help me wash my body nor provide any soap or any other cleanser. Also, the water for the first 10 seconds was cold; to that extent, I was at least able to hold my head and face under the stream; however, as it became hot for the last 20 seconds, the heat activated and exacerbated the gas' effects causing me to heave heavily and with great frequency in what someone observing who was not aware I had been gassed might deem a severe panic attack. Therefore, for the last 20 seconds I was only able to place my head under the water for 1 or 2 seconds at a time then having to ~~catch~~ catch my breath for 10 seconds or so. I did that two times. Lastly, although I had not realized it yet, my not being able to wash off the gas due to my restraints, small amount of time allowed to shower, staff refusal to assist me in decontamination and the gas' effects exacerbation due to the water's temperature, had caused the gas to spread like oil down my entire body not unlike, the spread of a growing fire in both effect and function.

31. As I was escorted in a hunched over position, still fully restrained, back to the same cell I was gassed in I complained that I couldn't see and needed to be decontaminated more. I was told by an unknown person "you don't need to see".

32. Even though I was bent over, struggling to walk, with my face just 1 or 2 feet from the ground, spitting out what gas I could, Def. 6 kept on shouting "don't spit on my officers." I repeatedly told him I was "spitting out gas" and that "I couldn't see".

33. I know I was put in the same cell again because I continued to react violently to the gas upon return to the contaminated cell, the cell is 3 feet away from the shower used allowing me to clearly ascertain both which shower was used and

which cell I was returned to, and also that is the only cell in the unit with bars used to four-point inmates. I know that the persons identified as making statements after I was blinded are those named persons because I recognized their voice.

34. Def. 6 then began to four-point me in the contaminated cell. This process took about 10 minutes because the right leg shackle had the hand cuff key broke off in the keyhole. This caused them to eventually retrieve a tool to remove the key or otherwise remove the restraint. Being four-pointed means to have each limb chained to a corner of the bed allowing almost no movement as one lay spread out on in my case, his back.

35. Over the 10 minutes I kept begging to be decontaminated, complaining that I couldn't see. I appealed to medical and the Lt., Defs. 6 and 8. For a few minutes I was choking/drowning in my saliva which filled my mouth as I was trying but unable to physically swallow and breathe. During this time or shortly before or after I began to writhe frantically in pain due to the gas' burning effects all over my body and my inability to breathe. I remember thrashing my limbs and heaving my body up and down shouting in a weak, labored and weazy voice "I can't breathe." I was effected so greatly by the gas due to my already fatigued, weakened and malnourished hunger-strike state, the duration and the closeness of the gas' use directly upon my mouth, nose and 2 eyes, the insufficient and indeed exacerbating shower causing the gas to spread and increasing its potency, and also by being put back in the same contaminated cell. The intense burning felt like my entire body was ██████ on fire, especially my penis and testicles because of the thinness and general sensitivity of the skin in the private area of me and all men; this thinness and sensitivity made an already unbearable and exacerbated burning far the excruciating

36. All of these torments, together and in isolation, caused me to continue to plead for decontamination saying, "have a li'lle mercy."

The nurse, Def. 8, then assessed my restraints and conducted a post use of force medical assessment as I at least pleaded to him to decontaminate my eyes, "my whole body is burning, but my eyes, I can't see!"

37. Either he or someone else wiped my eyes one time with my own shirt. Right after that everyone left. Def. 6 shouted as he was leaving, "Let's see how long you stay in these restraints!"

38. The ordeal in those early minutes caused me to think that I would die there and then. The confluence of all those factors caused such extreme pain, loss of control of my own body and limbs and inability to swallow or breathe such that it felt like a life-threatening experience.

39. Over the next two hours I tried to wipe my eyes with what portions of my fingertips I could extend to my eyes and the only pain or other symptoms previously experienced that resided are my thrashing and writhing and my hearing and my inability to breath and my inability to swallow. I remained blind, tearing uncontrollably, mucus continually falling down my face and neck and in excruciating fiery pain all over my face, body and private parts.

40. At the next two hour restraint check, Defs. 7 and 8 came to the cell and I again pleaded for decontamination but Def. 7 said, "you did this Abdo, these are the consequences for your actions" and refused to decontaminate me. I again told him I hadn't "assaulted anyone" the previous day. I remained in that state for another 2 hours, only able to see 1 and one-half hour later, albeit with difficulty.

41. Upon opening my eyes I noticed that the clean shirt I had been provided after the "decontamination" was covered in gas that had remained on my body and I also noticed copious amounts of gas on my arms and stomach and hands. When I was released from restraints I noticed that my

Face was completely orange from gas that remained on my face after decontamination. I also had to clean off not only that gas but I had to clean my private parts from the gas that spread their during the shower. My hair was also soaked with gas.

42. At ADX, that medical observation cell is 15 feet in distance from the door to the bed where the bars are that are used to restrain inmates in a 'four-point' position. I was checked every 15 minutes; however, the staff never entered the cell, opened the door and in fact completed the 15 minute general welfare check log from the outside of the cell every 15 minutes for four hours excepting of course the 2 hour restraint check above. Supra at ¶40.

## (Claims 15-18)

43. On 7-5-17, after being verbally harrassed and having my religion insulted and having my law library access usurped by Def.1, and after talking with a Lt. just days prior, all of this having occurred consistently over a period of two weeks, I tried to inform Def.1 that I would give my shaving razor to a Lt. only as I needed to again complain of being denied access to the Law library. Def.1, that day or very recently before then, told me that I would not be allowed to go to the law library for "the next three months" (i.e., the length of his rotation in Delta-unit).

44. Munoz was the only one to enter the cell to retrieve the razor and food trays, Johnston, Def.2, in violation of normal ADX policy and practice requireing at least two officers to enter a cell whenever one is required to do so, stood 10 feet away from my cell bars and 15 feet away from me, appx., resting on the far wall opposite to my cell door.

45. I was in cell D-C 501, the first cell on the range and which is so close to the range camera at the range entrance that not only is the door of the cell visable on camera but when the door is open, a large portion of the

inner cell is also visible on camera, as was the case here. The reason that this cell's insides are visible on camera is that the first cell of every range is the only cell equipped with bars used to 'four-point' inmates, i.e., whenever such restrained inmates at ADX are having their restraints checked by staff, this interaction is almost always recorded on camera as a protection to all parties. I further know this camera's field of vision because the monitors for the camera are viewable upon entering and exiting the unit, going to and from recreation and being in the 'interview room' all of which require the prisoner to pass by the monitors, as I have done several dozen times at least. This interaction too, as with all claims in this complaint, has contemporaneous video evidence of the interaction at issue.

46. While standing absolutely still in the middle of my cell, 7 feet from the bars and 9 feet from Def. 1, I tried to explain the issue to him but he took out his gas and held it for 8 seconds or so in his hand before emptying it in my unsuspecting face. Def. 2 didn't seem surprised. He calmly pressed the 'body alarm' button for backup.

47. After being gassed, I stumbled backward and fumbled for a towell to wipe my face because I couldn't see. I was also burning and tearing, having trouble breathing and having mucus pour from my nose.

48. A few minutes later, Lt. Behle arrived and cuffed me up for decontamination and medical assessment. I was then put in full ambulatory restraints, see supra at ¶19, and dragged painfully by the restraints to a large kitchen sink. I complained that my wrist was in pain because I was being dragged by the restraints or that they were being applied too roughly and very tight but Lt. Behle started cursing at me. When I came to the sink, my head was forced under a running faucet upside down as I was fully restrained and being subdued by at least two guards.

49. The water began to run into my nostrils and I tried to move my head but couldn't, struggling to speak I shouted "are you trying to waterboard me?", but they continued to hold my head under the water. I felt like I was drowning and knew that this is what waterboarding was even though I had only heard it described before. This continued, I appro-ximate, for a very short time, less than 45 seconds.

50. I was then medically assessed and complained of numbness to my left or right wrist. I believe it was my left even though the scar has since cleared up causing me some confusion in memory.

51. 2 hours later, I stated that I had been assaulted on camera when I saw Munoz, Def. 1, come to conduct a second medical assessment. The next day I began a 54 day hunger strike in protest of the third assault of staff against me and refused to eat until, among other requests, I talk to an OIG representative about a pattern of assault by ADX officials and an investigation be conducted.

52. On 6-29-17 and 7-4-17 I had already complained to two separate Lts. about my access to the law library and Def 1's verbal abuse. I had, thus, repeatedly exhibited a willingness to non-confrontationally solve my issue. Further, the Disciplinary Hearing Officer, when hearing the charge of attempted assault by me on Def. 1 regarding this event, chose to dismiss the charge. See Ex. 3

53. I have never been decontaminated like that before, I have always been given a shower or had my eyes washed with a special solution then, after all assessments, allowed to wash myself in a shower without restraints.

54. Because my cell was at the range entrance, I overheard Munoz distinct high pitched voice talk to Lt. Behle who authorized him to gas me if I continued to "make noise" about the law library.

## D. CAUSE OF ACTION

State concisely every claim that you wish to assert in this action. For each claim, specify the right that allegedly has been violated and state all supporting facts that you consider important, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific cases to support your claim(s). If additional space is needed to describe any claim or to assert more than three claims, use extra paper to continue that claim or to assert the additional claim(s). The additional pages regarding the cause of action should be labeled "D. CAUSE OF ACTION."

1.   Claim One: _____

    Supporting Facts:

    See following pages.

## D. Cause of Action /// Standing

<u>Claim 1</u>, Battery of Def. 3 asserted against the U.S., Def. 9:

55. Def. 3 is liable due to Colorado Law because he physically assaulted Plaintiff, see supra ¶¶ 11-15, and because he intended to harm Plaintiff as is represented by his verbal threats, insults and insti-gation of Def. 5 to strike a submissive inmate, supra ¶ 7, 15. His intent to harm is also shown by his violation of B.O.P. policy, and my constitutional Eighth Amendment rights as asserted in this complaint, see[infra] ¶¶ 58, 59, and by his refusal to stop the assault and allow me to comply, supra ¶ 12-15. Compare White v. Muniz, 999 P.2d 814, 16 (Colo. 2000) ("Circumstantial evidence [, here, B.O.P. policy] can pinpoint the thoughts or of another" [alteration in original] and id. at 17-18 (in determining whether "[every] appreciated the offensiveness of her conduct.... [the jury] necessarily had to consider... her age, infirmity, education, skill, or any other characteristic as to which the jury had evidence") [alteration in original] and Polanco v. Roth, 2014 Bankr. LEXIS 703 (Bankr. D. Colo. Feb. 21, 2014) ("[in Colorado Law] the requirement of maliciousness is satisfied upon a showing the injury was inflicted without just cause or excuse," such as the violation of B.O.P. policy or the U.S. Constitution), with Ex. 2, 5: Part 5.a.a [Def.] used immediate force when Plaintiff was not exhibiting" the behavior described in §552.20" and even if he were, it was not an "immediate, serious threat to... staff... or... security," see Ex. 2, 6: Part b. (calculated force to be used where an inmate can be "isolated (e.g., a locked cell, a range)"), and Ex. 2, 7: Part d. ("exception[s] to [immediate use of force] procedures outlined in this rule is prohibited"), and Ex. 2, 8: Part 6. b., c. ("force may not be used to punish", and "c. staff shall use only that amount" of force necessary to gain control of the inmate," but see supra ¶¶ 11-15), and Ex. 2, 18: Part 11.c.c (chemical agents only authorized when "a delay... would constitute a serious hazard to... others, or would result in a major disturbance," but see supra ¶ 8 (Def. 3 leaves the unit). See generally Sullenger v. Oakes, 473 F.3d 731, 40 (7th Cir. 2007) (officers departure in a use of force situation raises question of fact of the "threat" officers perceived) cited in Weigel v. Brady, 1544 F.3d 1143, 53 (10th Cir. 2008) (similar)), and Ex. 5, 6 Part 7 (not allowed a required chance to comply," see supra ¶¶ 12, 14], and Ex. 2, 9 Para. 3 (staff may not "intimidat[e]" inmates, see supra ¶¶ 7-14).

**Claim 2**, Battery of Def. 4 asserted against the U.S., Def. 9, or in the alternative, sexual battery:

56. Def. 4 is liable under Colorado law because he physically assaulted Plaintiff, see supra ¶¶ 11, 14 (physical assault on Plaintiff's leg and testicles). The intent element is shown by the same legal arguments recited before, see supra ¶ 55, I will only refer to the facts here. Def. 4's intent to harm is shown by the violation of Plaintiff's Eighth Amendment rights, see infra ¶¶ 60, 61; also, it's shown by his violation of B.O.P. policy on use of force, see supra ¶ 55, 18:21-26, 27 (Def. 4 stated, "we are gonna fu×× you up, it's too late [to comply]," supra ¶ 12; see also supra ¶ 14), 29-30 (Def. 4 ordered the gas. But see supra ¶ 11 (Def. 3 was the gas)). Lastly, Def. 4's intent is shown by his verbal threats and insults, see supra ¶¶ 7-8, 12, 14, and by his refusal to let me comply, see supra ¶¶ 12, 14. Other policy violations are supra ¶ 55, 18:34-36.

**Claim 3**, Battery of Def. 5 asserted against the U.S., Def. 4:

57. Def. 5 is liable under Colorado law because she physically assaulted Plaintiff, see supra ¶ 15 (hit with baton). The intent element is shown by the same legal arguments recited before, see supra ¶ 55, i'll only refer to the facts as applies to this Defendant. Her intent is shown by her violation of Plaintiff's Eighth Amendment rights, see infra ¶¶ 62, 63; also by her violation of B.O.P. policy, see supra ¶ 55, 18:21-28 (she hit Plaintiff who was trying to comply and who had his leg 'neutralized' by Def. 3, see supra ¶¶ 12, 14-15).

**Claim 4**, Eighth Amendment Excessive Force against Def. 3:

58. The following acts meet the objective prong. His use of gas, see supra ¶ 11, and slamming my leg against protruding locking mechanisms, see supra ¶ 16. Despain v. Uphoff, 264 F.3d 965, 78 (10th Cir. 2001) ("Mace can be excessive force"); see also Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992) ("[T]here is no need for significant or lasting injuries if the infliction of pain was wanton"); Wilkins v. Gaddy, 559 U.S. 34, 38-39 (2010) (same). The bruises, swelling and long term nerve pain that was medicated, see supra ¶ 17, and the baton strike, see supra ¶ 15, also meet this standard. ███████ He is also responsible for the acts of the other Defs. because their conduct is aggregated under the law.

59. The subjective prong is shown as follows. His threats, insults and instigation of Def.5 to strike a submissive inmate, supra ¶¶7,15. See Bozeman v. Orum, 422 F.3d 1265, 71 n.11 (11th Cir. 2005)(threats "can [help in] the determination of... the officer's subjective state"); accord Mann v. Failey, 578 F. App'x 267, 72 (4th Cir. 2014)(same). It's also shown by his violation of B.O.P. policy, supra 18:21-36 (page:line(s) designation; incorporating facts). Giron v. Corr. Corp. of Am., 191 F.3d 1281, 90 (10th Cir. 1999)("where there is no legitimate penological interest... the conduct itself is sufficient evidence [of] malice.")(quoting Whitley v. Albers, 128 L.Ed.2d 811 (1986)); see also Furnace v. Sullivan, 705 F.3d ▓▓ 1021, 29 (9th Cir. 2012)(no justification for force when inmate unable to comply). ↑——29

## Claim 5, Eighth Amendment Excessive Force against Def. 4:

60. The following meets the objective prong, see supra ¶¶58,14 (punches), where I incorporate Def.3's acts and the legal arguments here, as well as Def. 4's own acts. See also Ex. 6, 2-3 (bruise affidavit).

61. The following meets the subjective prong. His insults and threats, see supra ¶¶7,8,12,14, and his refusal to let me comply, see supra ¶¶12,14. Bozeman, 422 F.3d at 71 n.11 (threats help find malice); Mann, 578 F. App'x at 72 (same); Grunwald v. Madden, 274 F. App'x 667 (10th Cir. 2008) (refusal to allow inmate to comply stated claim). It's also shown by his violation of B.O.P. policy; see supra 18:21-36 (incorporating arguments). Giron, 191 F.3d at 1290 (acts with no penological interest are malicious).

## ▓▓ Claim 6, Eighth Amendment Excessive Force against Def. 5:

62. The following meets the objective prong, see supra ¶58 (incorporating arguments). See also supra ¶14 (punches); Ex. 6, 2-3 (bruise aff.).

63. The following meets the subjective prong. The violation of B.O.P. policies, see supra ¶¶55, 18:21-28 (page:line count; she hit Plaintiff who was trying to comply and whose leg was 'neutralized' by Def.3, supra ¶¶12,14,15). Giron, 191 F.3d at 1290 (acts contrary to policy are malicious). Due to the aggregation of the Defs.' conduct, she is responsible for the other Defs. conduct.

**Claim 7**, Battery of Def. 6 asserted against U.S., Def. 9:

64. Def. 6, Fernandez, is liable under Colorado law because he used his mace canister, supra ¶ 26, and because he intended to harm Plaintiff. The intent element is met by the following. His violation of my Eighth Amendment rights, see infra ¶¶ 68-71. It is also shown by his violation of B.O.P. policy in using force. Compare supra 18:8-20 (case law showing violation of laws can be malice) ▮ with Ex. 2, 4 Part 2, b, f. (force only used to "subdue" and chemicals only used when prisoner poses threat to staff, but see supra ¶¶ 25, 26 (force deployed for several seconds upon a clearly restrained non-resisting inmate). See also Ex. 2, 13 Part 9. (restraints a method [of] control [over] the inmate "and are applied to "protect[] ▮ staff"); Ex. 2, 9 Part g. (restraints used to "control"); Ex. 2, 8 Part d. (restraints are used to prevent behaviors that authorize force to be used, i.e., no force is to be used on fully restrained inmates)), and Ex. 5, 3 Part L. (gas not to be used at a range closer than four feet, but see supra ¶ 26 (used inches away)), and Ex. 5, 6 Part 5. (only to be used in a "2 second burst" but see ¶ 26 (used for five seconds until empty)), and Ex. ▮ 5, 6 Part 9. (indicating gas 'use inappropriate on restrained persons). His intent is also shown by his verbal retaliatory statements indicating his pleasure in my pain and his anger at my peaceful protest to hold staff accountable by refusing to come out of restraints, see supra ¶¶ 20-21 and 37 (restraints details), 29 (shouting at me over allegedly "assault[ing]" staff previously the day prior), 31 (he may have been the one who made this statement, "you don't need to see"). cf. Ex. 2, 8 Part 6. b. (force may not be used to punish").

**Claim 8**, Negligent Performance of Def. 6 asserted against U.S., Def. 9; or in the alternative, Negligence arising out of the "special relationship":
▮

65. Def. 6 is liable according to Colorado law and 18 U.S.C. § 4042 (a) (duty of care owed by custodian staff to dependent inmates). Jefferson Cnty. Sch. Bd. v. Justus, 725 P. 2d 767 (Colo. 1986)(The American Law Institute's Second Restatement of Torts, § 323 applies to non-feasance and misfeasance, i.e., negligent performance).

66. Def. 6's negligence is apparent because his failure to follow decontamination policy "increased the risk of ... harm," Second Restatement of Torts [hereinafter Restatement], §323, by causing the gas to spread, not clearing plaintiff's body of gas and by putting plaintiff in the same contaminated cell in which gas was used, supra ¶¶30, 31, 35, 41. Cf. Ex. 5, 6 Parts 8 (procedures for decon. contamination include "Fresh air" and the use of "soap" before an assessment). Def. 6's negligence also sources from "the harm ... suffered because of [my] reliance upon the undertaking" of Def. 6 to decontaminate me, Restatement, §323 Part (b), which is shown by the fact that he was the highest ranking official present and the one who is generally charged with supervising decontamination and application, use and removal of restraints. Ex. 2, 15 Part e., 18 Part 12a. See generally Justus, 725 P.2d 767 (treating with approval Restatement, §323).

67. Def. 6 had no discretion in violating policy, supra ¶66, nor in violating Plaintiff's Eighth Amendment rights, see infra ¶¶68-71. United States v. Gaubert, 499 U.S. 315, 24 (1991) (no discretion in violating Federal Laws); Spotts v. United States, 613 F.3d 568, 69 (2010) (question of whether a const. violation precludes discretion function exception not yet addressed by 5th Cir.).

Claim 9, Eighth Amendment asserted against Def. 6:

68. Def. 6 is liable because of his excessive use of force (gas) and the over-lapping and/or merging claim of refusal to decontaminate properly all of which violated B.O.P. policy.

69. Def. 6 is liable of the objective component because he used mace wantonly. Despain, 264 F.3d 965, 78 ("Mace can be excessive force); Northington, 973 F.2d at 1518 (no need for lasting injuries if pain was wantonly inflicted). Also, because of the physical pain that resulted therefrom, supra ¶¶ 26, 28, 30, 35, 36, 39. Def. 6's acts also meet the objective component due to Plaintiff's psychological torment, supra ¶38, Benefield v. McDowall, 241 F.3d 1267, 72 (10th Cir. 2001).

70. Def. 6 meets the subjective component due to the following. His retaliatory statements concerning my alleged 'assault of officers' the prior day, supra ¶29, his retaliatory statements showing his vengence at me refusing to

come out of restraints, supra ¶ 37, and his violation of use of force policy, see, supra ¶ 64, 21:6-25 (page:line count) (incorporating policy violations and subjective component argument into const. claim), Bozeman, 422 F.3d at 1271 n.11 (threats can determine malice); Coiron, 141 F.3d at 1296 (acts contrary to penological interest are malicious) (quoting Whitley v. Albers, 128 L Ed 2d 811 (1486).

71. Def. 6 is liable for pain caused by his failure to decontaminate such as constitutes an ongoing use of force or a seperate deliberate indifference claim because he failed to follow decontamination policy, supra ¶ 66 (incorporating policy violations into this const. claim), was aware of Plaintiff's need for decontamination, supra ¶¶ 31 (someone, who may be inferred to be him, said "you don't need to see"), 32 (same), 35 (obvious choking, frantic writhing and continued pleas for help), 36 (same), 37 (statement of Def. 6 indicating pleasure at my helpless suffering state), and was aware that Plaintiff's symptoms of pain and agony were not normal responses to gas, Ex. 5, 5 Part 4, (describing normal symptoms not including choking, inability to swallow and loss of muscle control) also, he repeatedly failed to respond to Plaintiff's pleas for "mercy" and decontamination, supra ¶¶ 31, 35, 36. See generally Clement v. Gomez, 298 F.3d 898 (9th Cir. 2002) (no decontamination states const. claim); Mata v. Saiz, 427 F.3d 745, 57 (10th Cir. 2005) (standards or other prison procedures may "provide circumstantial evidence that a prison healthcare gatekeeper knew of a substantial risk of serious harm" where the policies instruct staff to act in certain situations. Even if no policy is violated, the policy's existence may be evidence of a defendant's knowlege of risks inherent in those instruction worthy situations); Danley v. Allen, 540 F.3d 1298 (11th Cir. 2008) (no decontamination stated claim); Williams v. Benjamin, 22 F.3d 756 (4th Cir. 1440) (same).

## Claim 10, Negligent Performance of Def. 8 asserted against U.S., Def. 9:

72. Nurse Williams, Def. 8, is liable under Colorado law for his negligent performance of his duties to treat my injuries and in light of a duty of care codified in 18 U.S.C. 4042(a) (B.O.P. duty of care owed to dependent prisoners),

73. Although Plaintiff was blind, supra ¶28, because Def. 8 was present through the interaction, supra ¶¶27,36, it can be inferred that he may be the one who very inadequately tried to decontaminate Plaintiff by wiping my eyes, supra ¶32.

74. Def. 8 was under a duty to do the following policy dictates, Ex.2, 16 Part F. ("ensure appropriate breathing and response"); Ex.2, 19 Part a. ("assume responsibility for the inmates care" if needed, i.e., he had authority to treat Plaintiff); Ex.2, 19 Part b. (to have an inmates "injuries noted, immediately treated")

75. Def. 8, in recognizing Plaintiff's obvious need for decontamination for all of the policy related reasons stated before, supra ¶¶ 71, 23:8-14, including the fact he was present when gas was deployed and when Plaintiff was inadequately decontaminated, supra ¶¶27,36, coupled with the fact that gas was visable on Plaintiff's body, supra ¶41, not only required Def.8 to clear Plaintiff's body of the gas, but do so in a manner dictated by policy, i.e., Ex. 5, 6 Part 8 (fresh air, soap). Thus, when Def.8 wiped Plaintiff's eyes, supra ¶32, he negligently performed the treatment of decontamination he saw as necessary due to his act of wiping my eyes. The failure to decontaminate caused the injuries stated above, supra ¶¶ 28,30,35,36,38, 39. Lastly, outside of the duty of care owed by my custodians, 18 U.S.C. § 4042(a), the duty of care owed by a health professional to his patients and outside those duties listed above, supra ¶74, Plaintiff depended/relied on Def.8 to fulfill his duties for wholly another reason. See Restatement, § 323 Part (b) (liability when "the harm is suffered because of the others reliance upon the undertaking"). Under policy, because a healthcare professional is required to assess an inmates health post use of force, when Def.8 responded in fulfillment of that policy dictate but was "negligent... in the manner of his performance of the undertaking [decontamination]", Restatement, § 323 Part a., and when he failed to "protect [me] when he discontinued" his treatment of decontamination, Restatement, § 323 Part a., by calling some other health professional to fulfill those duties, I was necessarily harmed by my reliance on him; had he recused himself, policy would have required I be assessed by another nurse who would have been presumed to be a policy abiding professional who would have decontaminated Plaintiff. See generally Justus, 725 P.2d 767 (Colo. 1986) (treating Restatement, § 323).

76. A perhaps, separate cause of action is found for substantially all of the same reasons stated before, *supra* ¶¶ 72-75, except that instead of a negligent attempt at decontamination as evidenced by his wiping my eyes, it is the negligent refusal to provide treatment for "any injuries," Ex. 2, ¶9 Part b, namely, the injuries caused by gas. Noteably, he was negligent here for not providing treatment generally, as opposed to not providing treatment according to decontamination procedures. In essence, because Plaintiff's injuries and pleas were numerous, consistent and obvious, *supra* ¶¶ 27, 28, 30-33, 35-37, he was negligent in not noticing the need for treatment. Clark v. Bunell, 470 P. 2d 42, 45 (Colo. 1970)("[W]e have in a number of cases held that it is one's duty to see that which is plainly visable."); Werner v. Schrader, 127 Colo. 523 ("Our Court has repeatedly held that, for a person to look in such a manner as not to see what must be plainly visable, is of no more effect than if he does not look at all.").

77. Def. 8 had no discretion in violating B.O.P. policy, *supra* ¶74, nor in violating Plaintiff's Eighth Amendment rights, *infra* ¶¶ 78, 79. United States v. Caubert, 499 U.S. 315, 24 (1991)(no discretion in violating federal laws).

Claim II, Eighth Amendment Deliberate Indifference Claim against Nurse Williams, Def. 8:

78. Def. 8 meets the objective component for the reasons stated above, *supra* ¶ 69, 22:29-32 (page: line count).

79. Def. 8 meets the subjective component for the following reasons. He was present throughout the incident, *supra* ¶¶ 27, 36, he was therefore aware by his presence and by Plaintiff's verbal complaints, *supra* ¶¶ 27, 28, 30-33, 35-37, of Plaintiff's pain, agony and need for treatment. Further, due to his presence, he was aware of Def. 6's failure to follow decontamination policy, *supra* ¶66 (incorporating policy failures). He was also aware that Plaintiff's symptoms weren't reminiscent of those chemical exposure symptoms listed in policy, *see* Ex. 5, 5 Part 4 (not listing choking, inability to breathe, inability to swallow, loss of muscle control). This shows awareness of those 'objective' serious medical needs listed above, *supra* ¶78.

See generally supra ¶ 71, 23:19-27 (page: line cont) (citing case law on refusal to decontaminate). Also, unlike Def. 6, Def. 8 returned after 2 hours and still didn't help Plaintiff. See Supra ¶ 40. Lastly, his indifference is also shown by his omission of any data regarding the injuries I sustained, symptoms I exhibited, in his report. Ex. 7 (noting at 7:45 and 11 am "No injuries"). This shows that he made no attempt, nor did he recognize any reason, to decontaminate Plaintiff/pie. This isn't a situation where there was a good faith effort to prescribe some form of treatment that failed to help the Plaintiff.

**Claim 12**, Negligent Performance of U.S. against Def. 9, U.S.:

80. Def. 9 failed to conduct 15 minute 'welfare checks' on Plaintiff while he was four-pointed, see supra ¶ 42, for four hours. The checks are mandated by policy, Ex. 2, 14 Part 10.d. ("Staff shall check the inmate at least every fifteen minutes... to ensure... the general welfare of the inmate (and proper circulation of blood)."). Had these checks been done, then Plaintiff would have been decontaminated and his injury ended. It is impossible to check Plaintiff's welfare, and especially his circulation, from 15 feet away. Restatement, § 323 Part a. ("It applies whether the harm to the other... results from the ... negligent conduct in the manner of his performance, or from his failure to exercise reasonable care to complete it"), construed in Justus, 725 P.2d 767 (Co. 1986).

81. Plaintiff's reliance is predicated upon his custodial relationship with the B.O.P., 18 U.S.C § 4042(a) (duty of care owed to protect prisoners), his obvious helplessness as a four-pointed blind prisoner, supra ¶¶ 28, 34, 42, and the implicit meaning of the policy statement that has doctor-patient health safety concerns in mandating 15 minute checks to ensure blood flow and general welfare, Ex. 2, 14 Part 10. d. ███████

82. Def. 9 is liable, herefore, under Colorado law.

83. Def. 9 had no discretion to violate Federal regulations; see supra ¶ 80 (15 min. checks). Cf. Gaubert, 499 U.S. at 324 (no discretionary exception when policy violated).

Claim 13, Negligent Performance of Melvin, Def. 7, against the U.S., Def. 9:

84. Def. 7 is liable under Colorado law and in light of 18 U.S.C § 4042(a) (duty of care owed by custodian gaurds to dependant inmates).

85. Def. 7 negligently performed the 2 hour restraint check man-dated by policy, see Ex. 2, 15 Part e. Restraints are not to be used as, "a method of penishing," "or in "a manner that causes unnecessary physical pain or extreme discomfort"; further, restraints are intended to have a "calming effect." Id. at 8, Part 6. b.; 9, Part h. (3); 15, Part e. But, see supra ¶40 (restraints used as a tool to penish and make me endure the gas' effects with no help or decantaminition nor concern for whether the restraints are calming anyone).

86. Plaintiff's reliance on Def. 7 stemmed from his general helpless state and pleas for help, supra ¶40, the custodial capacity of the B.O.P. towards prisoners, 18.5.C. 4042(a) and from the following policy argument. See generally Restatement, §323 Part (b) (liability, when "the harm is suffered because of the others reliance upon the undertaking"). Under policy the restraint checks are mandatory, Ex. 2, 15 Part e.; thus, if Def. 7 had recused himself it would have been required to provide Plaintiff another Lt. who can be assumed to be a policy abiding proffesional who would have not only considered the need for restraints, but would have decontaminated Plaintiff ending his pain. In essence, Def. 7's presence necessarily precluded other Lt.s from conducting that check; thus, Plaintiff relied upon this particular Lt. to conduct the check with due care, assess the need for restraints without vengence and call for somone to assist Plaintiff in decontamination via policy, Ex. 5, 6 Part 8.

87. Def. 7 had no discretion in violating Plaintiff's Eighth Amen-dment rights, see infra ¶¶88, 89, nor in violating the policies stated above, supra ¶85, nor in refusing to decontaminate Plaintiff's

**Claim 14**, Eighth Amendment Deliberate Indifference against Def. 7:

88. The objective component is met by the burning of my penis and testicles, body and face, blindness and stinging and burning and tearing of the eyes as well as the uncontrollable flow of mucas. See supra ¶¶ 39, 40. See also supra ¶¶ 58 (citing case law on mace and injuries under the eighth amendment), 71 (citing case law on refusal to decontaminate and the inferences policies allow as to the knowledge an official has as to the risks of harm posed to prisoners). See generally Estelle v. Gamble, 429 U.S. at 104 (the Eighth Amendment forbids the infliction of wanton and unnecessary pain; accord Blackmore v. Kalamazoo Cnty, 390 F.3d 890, 99-900 (6th Cir. 2004) (right to avoid pain due to officers indifference); Cooper v. Casey, 97 F.3d 914, 16-17 (7th Cir. 1996) (pain from beating stated serious medical need); Spruill v. Gillis, 372 F.3d 218, 36 (3d Cir. 2004) (back pain)).

89. The subjective component is met by the following. His statement showing his retaliatory motive, his intent to punish. See supra ¶ 40. See also Bozeman, 422 F.3d at 1271 n.11 (threats can help determine malice). His malice is also shown by his violation of policy prohibiting restraints from being used to punish "or cause" unnecessary pain." Ex. 2, 8 Part 6-b.; 9, Part h. (3). Cf. Coiron, 191 F.3d 1281, 90 ("Where there is no legitimate penological interest [i.e., acts contrary to policy]... the conduct itself is sufficient evidence of malice.").

**Claim 15**, Battery against Def. 9 due to acts of Def. 1, Munoz:

90. Def. 1 is liable under Colorado law because he physically hurt Plaintiff by using gas, supra ¶¶ 46, 47. He intended to harm Plaintiff because of the following. He had previously had a prior two week dispute with me over his usurpation of my access to the law library, supra ¶¶ 52, 54, of which this was a part. He had over the same time period verbally insulted me and my religion in the course of my complaints, supra ¶ 43. He had intended to gas me well before the 'immediate need for force' arose over nothing more than my complaints about the library as opposed to me actually posing a threat, supra ¶ 54.

Polance, 2014 Bankr. LEXIS 703 (Bankr. D Colo. Feb. 24, 2014) (in Colorado, "the requirement of maliciousness is satisfied upon a showing the injury was inflicted without just cause or excuse"). As stated in this subsection, Munoz intent was malicious and personal, not penological. Cf. Ex. 3, 2 Part 'Summary of Charges' (charged with attempted assault), 3 Part V. (I was not "held accountable" for that charge), 3 Part V. (reason for gas was my alleged attempted assault, "Abdo made an aggressive move"). Further evidence of his intent to fabricate a use of force situation is the fact that policy at ADX requires two staff to enter a prisoners cell for security reasons, supra ¶44, but Def. 2 stood well away from the cell on this occassion indicating he knew Def. 1 intended to gas me and distanced himself from the gas ahead of time, id. Further proof is shown by the fact he had his gas already out before I allegedly tried to assault him. Compare supra, ¶46, with Ex. 3, 3 Part V. (gas used for my 'attempted assault' but I was acquitted of the charge). A final piece of evidence is that Def. 2 didn't seem suprised that gas was used, supra ¶46.

91. Intent is also found by Munoz violation of policy by using force to "punish" and under circumstances not authorized by use of force dictates. Ex. 2, 5 Part 5, a. (describing behavior authorizing force); Ex. 2, 8 Part 6, b. Intent is also found by his violation of Plaintiff's Eighth Amendment rights, see infra, ¶¶92, 93.

## Claim 16, Eighth Amendment against Def. 1:

92. The objective prong is met by his use gas and its effects, supra ¶¶46, 47. See also supra ¶58 (citing case law on mace and injury such as constitutes a constitutional claim)

93. The subjective prong is met due to the following. Malice is shown by his recent history of threats, insults and usurpation of my access to the law library, supra ¶¶43, 52, 54. Bozeman, 422 F3d at 1271 n.11 (threats can determine malice). Malice is also shown by his premeditated attempt to turn a non-violent situation into one where he could use gas in an effort to cause me harm. See supra ¶¶90, 28:33-29:17 (page: line)

(describing facts showing his perpetuation of a conspiracy to hurt me). His malice is also shown by his violations of B.O.P. policy, see supra ¶91 (incorporating policy violations). Crisos, 191 F.3d at 1290 (acts contrary to policy necessarily show malice)(quoting Whitley v. Albers, 128 L.Ed.2d 811 (1986)).

## Claim 17, Failure to intervene claim of Def. 2 (i.e., 8th amd. claim)

94. IF Def. 1 is found liable, Def. 2 is liable. Casey v. City of Fed. Heights, 509 F.3d 1278, 83 (10th Cir. 2007)("[T]here is an affirmative constitutional duty to stop other officers from using unconstitutionally excessive force.").

95. Evidence of Def. 2's knowledge of an impending constitutional violation has already been discussed. See supra ¶90, 28:33-29:17 (page & line count).

## Claim 18, Battery against Def. 4, U.S.:

96. Def. 4 is liable under colorado law for waterboarding Plaintiff under the guise of decontaminating him. See supra ¶¶ 48,49,53.

97. Def. 9 is liable because of the harm inflicted on Plaintiff, supra ¶ 49. Def. 9 intended the harm because the manner of decontamination was never before used on Plaintiff, supra ¶53, the manner of decontamination very obviously causes one to drown to any rational observer, supra ¶¶ 48,49, and because I began to struggle and tell them they were waterboarding me, supra ¶49, but they continued anyway. Also, intent is shown by the fact that not only did Lt. Behle, the one overseeing the decontamination, previously authorize Def. 1 to use illegal force against me, see supra ¶¶ 90, 28:33-29:17 (explaining conspiracy of staff), 54 (Lt. Behle's illegal authorization), but also by the fact that as I was complying to be cuffed up, Lt. Behle became irate and began cursing at Plaintiff, supra ¶ 48. ▓▓▓▓ Malice can be shown by "circumstantial evidence". White, 999 P.2d at 816.

# <u>Addendum to:</u>

Claim 1;
Claim 2;

Claim 4;
Claim 5;

Claim 15; and
Claim 16.

98. Defs' 3, 4 and 1 have also shown their malice by a final indicater, the violation of B.O.P. policy outlining mandatory ethical standards, see Ex. 9, 9 Part E. ("[E]mplo-yees may not use profane, obscene, or abusive language when communicating with inmates."). The relevant case law tying policy violations to malice have already been stated in the aforementioned claims.

32

## E. PREVIOUS LAWSUITS

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? ___ Yes X No (CHECK ONE). If your answer is "Yes," complete this section of the form. If you have filed more than one lawsuit in the past, use extra paper to provide the necessary information for each additional lawsuit. The information about additional lawsuits should be labeled "E. PREVIOUS LAWSUITS."

1. Name(s) of defendant(s) in prior lawsuit: _____

2. Docket number and court name: _____

3. Claims raised in prior lawsuit: _____

4. Disposition of prior lawsuit (for example, is the prior lawsuit still pending? Was it dismissed?): _____

5. If the prior lawsuit was dismissed, when was it dismissed and why? _____

6. Result(s) of any appeal in the prior lawsuit: _____

## F. ADMINISTRATIVE RELIEF

1. Is there a formal grievance procedure at the institution in which you are confined?

   X Yes ___ No (CHECK ONE).

2. Did you exhaust available administrative remedies? X Yes ___ No (CHECK ONE).

   See Ex. 1 (exhaustion proof)

## G. REQUEST FOR RELIEF

State the relief you are requesting. If you need more space to complete this section, use extra paper. The additional requests for relief should be labeled "G. REQUEST FOR RELIEF."

A) 10,000 dollars for each tort claim, severally and jointly, attorney fees for any attorney appointed, Any other relief the Court deems proper.

B) Monetary damages such as punitive, compensatory and nominal in amounts to be ascertained by an attorney if representation is attained. All damages are several and joint. Attorney's fees. Any other relief the Court deems proper.

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed on   1 - 15 - 19
         (Date)

_____
(Prisoner's Original Signature)